UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAOLO BRONZINO,

        Plaintiff,

vs.

Case No. 10-CV-13506

HON. GEORGE CARAM STEEH

CLINTON TOWNSHIP POLICE
SERGEANT DUNN, et al.,

        Defendants.

_____/

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#18)

This case arises out of the arrest of plaintiff Paolo Bronzino for delivery of analogues on December 16, 2008. Defendants are Sergeant (now Lieutenant) David Dunn, Detective Steven Blasky, Detective Todd Penick, Lieutenant Craig Keith, and Detective Matthew Gerling, all of whom are employed by the Clinton Township Police Department. The complaint alleges a violation of 42 U.S.C. § 1983 and assault and battery against the officers in their individual capacities. The case is before the court on defendants' motion for summary judgment.

FACTUAL BACKGROUND

On December 16, 2008, the defendant officers executed a felony delivery of analogues warrant for plaintiff Bronzino at his apartment in Shelby Township, Michigan. The officers first conducted surveillance of Bronzino's apartment. They observed a car pull up, a man get out of the passenger side, go up to the apartment unit, and then came out a short time later. The officers confronted the man, identified as Joshua Lehti, when he

returned to the parking lot. Lehti admitted he had made a drug purchase, and he agreed to help the officers.

The officers took Lehti, who was handcuffed, up to the unit and had him knock on the door so that when Bronzino looked out he would see Lehti and not the officers. When Bronzino opened the door, Officer Penick removed Lehti from the scene, while Dunn and Blasky, who were in plain clothes, showed their badges and went inside with weapons drawn. Dunn dealt with Bronzino while Blasky went into the living room/kitchen area and handcuffed the other two individuals inside the apartment, Milko Saran and Arian Camaj. Blasky did not encounter any resistence from Saran and Camaj. (Blasky dep. 19).

Dunn instructed Bronzino to get on the ground immediately inside the doorway. Bronzino states that he went to the ground, face down, and asked the officers two or three times what they were doing in his house. (Bronzino dep. 17-18). Dunn contends that Bronzino was screaming, attempting to get up off the ground, refusing to put his hands behind his back, and making it difficult for Dunn to put handcuffs on him. (Dunn dep. 25-27). Dunn describes that he holstered his gun, approached Bronzino's head, placed his knee on the upper part of Bronzino's back, pushed him down and handcuffed him. (Dunn dep. 25-26). Dunn had his knee on Bronzino's upper back for about ten seconds, until he could handcuff him. (Dunn dep. 27).

Bronzino testified he never tried to get up while on the ground, but that Dunn came at him with running force and stomped on his neck and shoulder. (Bronzino dep. 17-27). He heard an immediate cracking sound and felt extreme pain in his neck. (Bronzino dep. 26-27). Bronzino testified that he complained of pain immediately and asked to go to the

hospital, but was told by Dunn to "shut up and sit down." (Bronzino dep. 27). Bronzino contends that the pain made him cry, and that Dunn made fun of him, stating, "You're not a tough guy now, huh?" (Bronzino dep. 27-28).

The incident was witnessed by Camaj and Saran. Camaj states that while Bronzino was on the ground, one of the officers "ran at him, and jumped on top of him with his feet." (Camaj Aff. ¶ 9). Bronzino cried out in pain and said, "Ow, my neck, my neck." (Camaj Aff. ¶ 10). Bronzino asked to go to the hospital and was told by the officer to "shut up." (Camaj Aff. ¶ 16). After Camaj and Saran were finished being questioned, they were told to "forget what you just saw and get out of here". (Camaj Aff. ¶ 20). Mr. Saran states in his affidavit that while Mr. Bronzino was lying face-down on the ground, one of the officers ran at him, stomping on his back/neck. (Saran Aff. ¶ 9). He heard Bronzino cry out in pain, and was told by the officers "to forget what you just saw and get out of here". (Saran Aff. ¶ 10, 14)

Stephanie Dekoski was a third witness to the incident. She was standing in the hallway outside the apartment when she saw Bronzino lying face down inside the doorway of the apartment. (Dekoski Aff. ¶ 3, 4). Lt. [Dunn] slammed the door closed and then she heard Bronzino yell "Ow!" ((Dekoski Aff. ¶ 6). The next morning, Dekoski picked Bronzino up from jail and saw he had cuts, carpet burns and bruises on his face. (Dekoski Aff. ¶ 9). Bronzino complained that his neck and shoulder were hurting. (Dekoski Aff. ¶ 10). She took pictures of Bronzino's neck, shoulder and face the day after the incident, and also took him to the hospital. (Dekoski Aff. ¶ 12, 13, photos at Exhibit H). Bronzino testified that when Dunn stomped on his neck/shoulder he did so with such force that Bronzino's body and face slid on the carpeting, causing rug burn type abrasions. (Bronzino dep. 66-67).

Bronzino believes the abrasions on his neck and shoulder came from Dunn's shoe when he stomped on him. (Bronzino dep. 67). Booking photographs show abrasions over Bronzino's right eye and to the right side of his neck. (Exhibit I).

Bronzino was taken to Beaumont Hospital for treatment the next morning by Ms. Dekoski. He complained of neck pain, blow to head, chest pain, numbness and tingling. The hospital records note he had multiple abrasions to his shoulder, neck and face. (Exhibit G). Bronzino advised hospital personnel that he received his injuries when he was "kicked/stomped by police." (Exhibit G). He was provided medication, a shoulder immobilizer, care instructions and advised to follow up, particularly for treatment of his neck/shoulder. (Exhibit G).

Penick had taken Lehti to a common laundry room located 10 to 20 feet from Bronzino's apartment. Penick heard yelling from the apartment, "get on the ground, stay down" which indicated to him that Bronzino was resisting. (Penick dep. 16, 25). Penick rode with Bronzino back to the police station and did not hear him complain of pain or claim that excessive force had been used. (Penick dep. 25-26).

Blasky did not hear Bronzino complain of pain until he was at the police station, where Bronzino stated he had a previous shoulder injury that was aggravated as a result of the arrest. (Blasky dep. 24-25, 33). Bronzino did not ask for medical attention, nor did he appear to need any. (Blasky dep. 24).

Gerling, who entered the apartment after its occupants had been arrested, did not hear Bronzino say he was in pain. (Gerling dep. 17-18).

Bronzino was interviewed at the station by Dunn and Blasky. Bronzino admitted that pills and marijuana found in the laundry room belonged to him and that no one else in the apartment was involved. He agreed to become an informant and helped with one drug buy, but then said he did not want to do it again. Bronzino was charged with delivery of an analogue on June 2, 2009, and subsequently pleaded guilty. After he was charged, Bronzino filed his excessive force complaint against the officers.

According to Bronzino, doctors have recommended surgery on his cervical spine. Surgery has not been scheduled.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

ANALYSIS

I. Fourth Amendment: Excessive Force Allegation

    A. Lieutenant Dunn

In order to determine whether the individual defendants violated plaintiff's constitutional right to be free from excessive force, the court must first examine the

appropriate constitutional standard against which to measure the actions of the officers. See Graham v. Connor, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. . . . The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard."). A claim of excessive force against a public official in the course of an arrest or investigatory stop is analyzed under Fourth Amendment reasonableness stricture. Id. at 394-97. The plaintiff must prove that the official action was objectively "unreasonable" "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. "In evaluating whether an officer's use of force was reasonable rather than excessive, we consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Smoak v. Hall, 460 F.3d 768, 783 (6th Cir. 2006) (citation omitted). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002). The ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure." Ciminillo v. Steicher, 434 F.3d 461, 467 (6th Cir. 2006).

In assessing an excessive force claim, the court must construe all the facts in the record in the light most favorable to the plaintiff. Schreiber v. Moe, 596 F.3d 323, 332 (6th Cir.2010). Passive resistance has been held to warrant a limited degree of force, but the

extent of the resistance is central to the analysis. See Jackson v. City of Gahanna, 752 F.Supp.2d 830, 841 (D.D. Ohio 2010). For example, when a person has been handcuffed, less force will be justified as necessary. In Phelps v. Coy, 286 F.3d 295 (6th Cir. 2001), Phelps was handcuffed when Officer Coy tackled him and sat on top of him. At this point Phelps no longer presented a threat, so there was no governmental interest in continuing to beat Phelps. The court held that a reasonable officer would have recognized that beating Phelps under these circumstances was unnecessary, and constituted a violation of Phelps' Fourth Amendment rights. Id. at 301, 302.

Defendants point out that the officers were executing a felony arrest warrant for delivery of analogues, and that a drug crime is a serious crime. The officers were conducting a raid on a drug house and had no way of knowing whether the inhabitants were armed. Bronzino is six-feet three-inches tall, compared with Dunn, who is five-feet eight-inches tall. Bronzino's recitation of the facts is that he was lying down on the ground as instructed, with his cheek against the floor, repeatedly asking the officers what they were doing in his apartment. He does not address the officers' contention that he was yelling and screaming. (Blasky dep. p. 15; Dunn dep. pp. 25, 29). Bronzino's movement was not restricted at this point, he had not been checked for weapons, and his repeated questioning of the officers could be seen as ambiguous behavior that does not clearly communicate an intent to cooperate. Dunn then allegedly ran toward him and slammed his knee or foot down on Bronzino's neck in order to hold him still so he could be handcuffed. Bronzino's description of the events is supported by his friends' affidavits.

Deference is due an officer's on-the-spot decisions. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2158 (2001). The officers were entering a drug house to serve an arrest warrant, they did not now how many people occupied the house, or if any of them were armed. Lt. Dunn was responsible for handcuffing Bronzino, who was about seven inches taller than himself, and though lying face-down on the floor, was questioning the officer's purpose in being in his apartment, if not yelling and screaming at the officers. In order to handcuff Bronzino, Dunn determined that he needed to hold him down with his knee or foot. The amount of force Dunn used was a judgment call made in the heat of the moment, while faced with a degree of passive resistance from Bronzino.

The Sixth Circuit has addressed the deference due to an officer in the midst of making an arrest:

> [T]he kneeing and kicking occurred not when [the plaintiff] was neutralized, but while the officers were handcuffing him. . . . Although [the plaintiff] states that he was not resisting the officers during the take-down, this subjective intent to cooperate, absent any evidence that he clearly communicated that intent to the officers and given the totality of the circumstances that would suggest an opposite intent, is insufficient to overcome the built-in measure of deference to the officers' on-the-spot judgment about the level of force necessary.

Goodrich v. Everett, 193 Fed. Appx. 551, 556 (6th Cir. 2006).

In this case the evidence supports Lt. Dunn's subjective view that Bronzino was not cooperating with Dunn's attempt to place handcuffs on him. However, the rug burns and bruises on Bronzino support two possible versions of events - either Bronzino was struggling against Dunn, so more force would be justified, or Dunn used excessive force, not commensurate with Bronzino's level of resistence.

9

There is further evidence in the record to support plaintiff's version of events. Bronzino's arrest was allegedly witnessed by Mr. Camaj and Mr. Saran. Both witnesses submitted affidavits, but neither were deposed. Camaj and Saran each describe seeing an officer run at Bronzino and stomp or jump on his back or neck, followed by Bronzino yelling out in pain. Both witnesses further testify that they were told by unidentified "officers" to "forget what you just saw and get out of here." This testimony, if found to be credible, reflects a possible self-awareness of guilt on the part of Lt. Dunn. In addition, the incident report, which was prepared by Det. Gerling, does not indicate that Bronzino resisted arrest in any way. Gerling explained that he was not given any information regarding anything other than a normal arrest. (Gerling dep. 26). Missing from the report is the description of resistence given by Dunn at his deposition. (Dunn dep. 25-26). While not direct or conclusive evidence that excessive force was used, the discrepancy could be used by jurors to support Bronzino's version of events.

Therefore, there is an issue of fact whether Lt. Dunn used excessive force in neutralizing Bronzino in violation of his clearly established Fourth Amendment rights.

B. <u>Defendants Blasky, Keith, Penick and Gerling</u>

"Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." <u>Smoak v. Hall</u>, 460 F.3d 768, 784 (6th Cir. 2006) (citation omitted). Those present for an unconstitutional seizure can also be held liable for failure to protect. <u>Id.</u> (citation omitted).

Lieutenant Craig Keith was in charge of the shift on the day *following* the evening of December 16, 2008. He did not take part in executing the warrant and was not at the apartment. Keith reviewed and signed the report the following day and took it to the prosecuting attorney's office so they would authorize a warrant. (Keith dep. 7-9). Clearly Keith did not observe the use of excessive force, nor did he have the means to prevent harm from occurring. Defendant Keith should be dismissed from the case.

Officer Todd Penick was holding on to Joshua Lehti when Dunn and Blasky entered the apartment. Penick removed Lehti from the scene to the communal laundry room and stayed with him. (Penick dep. 13-14). Similarly, Detective Matthew Gerling did not enter the apartment until after Bronzino was handcuffed. (Gerling dep. 14-17). Blasky did enter the apartment with Dunn, but Blasky was in the process of handcuffing the other individuals who were present while Dunn was handcuffing Bronzino. (Blasky dep. 16-19).

There is no evidence that any of the other officers knew that any force would be used to handcuff Bronzino, nor did they have the means to prevent any harm from occurring in the short time that Dunn held Bronzino down in order to handcuff him.

C. Qualified Immunity

Even if plaintiff alleges facts which, if true, might allow a jury to find a violation of his constitutional rights, government officials performing discretionary functions are entitled to qualified immunity. Rich v. City of Mayfield Heights, 955 F2d 1092, 1094 (6th Cir. 1992). "The entitlement is an immunity from suit rather than a mere defense to liability . . . ." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Qualified immunity is purely a question of law for the court, and should be resolved as early in the case as possible. Poe v. Haydon,

853 F.2d 418, 424 (6th Cir. 1988).  However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.  Sova v. Mount Pleasant, 142 F.3d 898, 903 (6th Cir. 1998).

The Sixth Circuit has set forth a three-part test for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999).  Under this standard, defendant Dunn is entitled to qualified immunity if he can show that a reasonable officer would have believed that his actions were lawful in light of the clearly established law and the information he possessed at the time, as supported by the evidence.  See Anderson v. Creighton, 483 U.S. 635, 641 (1987).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Hunter v. Bryant, 502 U.S. 224, 229 (1991).

The plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity.  Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009).  A plaintiff must establish that the contours of the right in question are sufficiently clear that a reasonable official would understand that what he is doing violates that right.  The relevant inquiry in determining whether a right is clearly established is whether it would be

clear to a reasonable officer that the conduct was unlawful in the situation the officer confronted. Saucier v. Katz, 533 U.S. 194, 201-02 (2001).

If a jury believes Bronzino's account of Dunn stomping on his back and neck, such level of excessive force would violate a clearly established right of which a reasonable officer would understand. It would be objectively unreasonable for an officer in Dunn's position to display the level of force described by Bronzino if Bronzino was not resisting or obstructing arrest. Dunn would not be entitled to qualified immunity.

II. State Claim: Assault and Battery

Section 691.1407(3) of the Michigan Compiled Laws provides that governmental immunity "shall not be construed as altering the law of intentional torts." Moreover, "an individual employee's intentional torts are not shielded by the Michigan governmental immunity statute." Sudul v. City of Hamtramck, 221 Mich. App. 455, 458 (1997). Nevertheless, the measure of necessary force in the context of a police action "is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary." Anderson v. Antal, 191 F.3d 451 (6th Cir. 1999).

With respect to intentional torts, the Michigan Supreme Court held that, pursuant to M.C.L. 691.1407(3), lower level government employees are entitled to immunity for intentional torts if governmental immunity is raised as an affirmative defense and "(1) the employee's challenged acts were undertaken during the course of employment and . . . the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary,

rather than ministerial, in nature." Odom v. Wayne Co., 482 Mich. 459, 461 (2008) (citation omitted). The good faith element is subjective in nature. Id. at 481-82.

In this case, the officers were on duty, executing a felony arrest warrant. Clearly the officer defendants were acting in the course of their employment, and within the scope of their authority, when the incident at issue occurred. The allegation of excessive force is that Lt. Dunn stomped on plaintiff's back and even on his neck, while he was already neutralized. Lt. Dunn is not entitled to qualified immunity on plaintiff's assault and battery claim.

## CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is denied as to the claims asserted against Lt. Dunn, and granted as the claims asserted against the other defendants.

Dated: February 9, 2012

>  S/George Caram Steeh
>  GEORGE CARAM STEEH
>  UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on February 9, 2012, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---